IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VALERIA JOHNSON-BRASWELL, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : Civil Action No. 14-1089-RGA |
| CAPE HENLOPEN SCHOOL | : |
| DISTRICT, | : |
| | : |
| Defendant. | : |
| | : |

MEMORANDUM OPINION

Jared T. Green, Esq., SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, DE; Christine E. Burke, Esq. (Argued), KARPF KARPF & CERUTTI, P.C., Bensalem, PA.

Attorneys for Plaintiffs.

Marc S. Casarino, Esq. (Argued), Agatha C. Mingos, Esq., WHITE AND WILLIAMS LLP, Wilmington, DE.

Attorneys for Defendants.

September 2₉, 2015

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Plaintiff filed a four-count Complaint asserting claims under the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. (D.I. 1). Plaintiff voluntarily waived her Title VII and § 1981 claims by a stipulation of partial dismissal. (D.I. 40). Before the Court is Defendant's Motion for Summary Judgment (D.I. 43) on all remaining counts in Plaintiff's Complaint. The motion is fully briefed. (D.I. 44, 50, 52). The Court heard oral argument on September 2, 2015. (D.I. 54) For the reasons that follow, the Court will grant Defendant's motion for summary judgment as to the FMLA Interference and ADA Retaliation claims, but will deny Defendant's motion for summary judgment as to the FMLA Retaliation and ADA Disability Discrimination claims.

## I.    BACKGROUND

Plaintiff Valeria Johnson-Braswell was employed by Defendant Cape Henlopen School District for approximately seven years as a sign language interpreter for hearing-impaired students. (D.I. 1 at 3). Specifically, Plaintiff was employed as a paraeducator by the Sussex Consortium Program within the school district, which provided assistance to students with various types of disabilities. (D.I. 44 at 8). In this position, Plaintiff was assigned to perform sign language interpretation for a specific student within the school district throughout the school day. (*Id.*).

During the latter years of her employment with Defendant, Plaintiff began experiencing various health problems, including fibromyalgia, back pain, knee problems, and shoulder problems. (D.I. 1 at 3). During the 2010–2011 school year, Plaintiff requested, and the school district granted her, intermittent FMLA leave to attend doctor's appointments and otherwise care

2

for her various health conditions. (*Id.*; D.I. 44 at 9). Throughout the 2010–2011 school year Plaintiff used intermittent FMLA days for late call outs, partial days, and full days. (D.I. 44 at 9; D.I. 50 at 11).

The Sussex Consortium Staff Handbook had a policy in place that required employees who will be late or absent on a particular day, for whatever reason, to call in and leave a message on the Consortium voicemail "no later than 7:00 a.m. of the day absent." (D.I. 45 at 24).[1] The School District also had policies in place for monitoring, reporting, and handling violations of its attendance policy. (D.I. 45 at 26–40).

Defendant asserts that from September 2010 to December 2010, Plaintiff failed to follow the Consortium's callout procedure by neglecting to call in prior to 7:00 a.m. on days she was late or absent. (D.I. 44 at 10). Plaintiff had a meeting with school district representatives and supervisors on November 10, 2010 to discuss her purported failure to follow the callout policy. (D.I. 45 at 44). Defendant subsequently sent Plaintiff a letter reiterating Defendant's expectations with regard to the callout policy. (*Id.*). There followed two letters of reprimand to Plaintiff, one on November 30, 2010, and the second on December 15, 2010, due to Plaintiff's continued failure to follow the callout procedure when absent or arriving late. (D.I. 45 at 45–46). The December 15, 2010 letter states that Plaintiff "admitted to not calling [Sussex Consortium] . . . when late on numerous occasions but also as recently as 12/6/10." (D.I. 45 at 46). Plaintiff, on the other hand, contends that she always followed the callout procedure properly and that Defendant's allegations of her failure to do so are fabricated. (D.I. 50-1 at 38; D.I. 51-1 at 29).

Plaintiff went out on workers' compensation leave from approximately mid-January 2011 until mid-April 2011 and again briefly in June 2011. (D.I. 44 at 11; D.I. 50 at 13). At the start of

---

[1] The Handbook does not appear specifically to address lateness, as opposed to absence. Plaintiff does not dispute Defendant's assertion (D.I. 44 at 9) that the policy applies to lateness.

3

the 2011–2012 school year, Plaintiff again requested intermittent FMLA leave to attend frequent medical appointments. (D.I. 45 at 108). Three weeks later, Defendant responded by granting Plaintiff what it referred to as "intermittent unpaid medical leave." (*Id.* at 123). While it is now uncontested that Plaintiff did not actually qualify for FMLA leave during the 2011–2012 school year because of her failure to work a sufficient number of hours the previous school year, Plaintiff and Defendant contest whether the school district informed her that the leave she was granted during this school year was not actually FMLA leave. (D.I. 44 at 11; D.I. 50 at 16).[2]

During the beginning of the 2011–2012 school year, Plaintiff was again absent or late on numerous occasions. (D.I. 45 at 104). Defendant asserted that Plaintiff failed to follow the callout procedures when late, identifying one particular occasion. (D.I. 45 at 107; D.I. 50-1 at 54). Plaintiff contended that she did follow the callout procedures on the one identified occasion. (D.I. 50-1 at 56).

On September 26, 2011, Principal Vivian Bush wrote to Plaintiff reemphasizing the District's expectations with regard to the callout procedure and informing Plaintiff that she was "required to adhere to the high school hours [of] 7:30 a.m. to 3:00 p.m. starting immediately." (D.I. 45 at 124). The importance of timely notification was stressed in this letter, so that the school district would have "a reasonable amount of time . . . to find a substitute." (D.I. 45 at 124). In a subsequent meeting with Principal Bush, Plaintiff indicated that the mornings were the worst time for her fibromyalgia and asked for the accommodation of coming in at 8:00 a.m. and staying until 3:30 p.m. (D.I. 51-1 at 27). Plaintiff contends that Principal Bush was

---

[2] There is a notation that Plaintiff was left a voice mail that she did not qualify for FMLA. (D.I. 45 at 108). There is nothing in writing to Plaintiff telling her she did not qualify for FMLA. Sussex Consortium administrators sometimes referred to her "intermittent unpaid medical leave" as "FMLA leave."

4

unwilling to engage in a discussion about this accommodation and that her answer was simply "no." (*Id.*).

On March 2, 2012, the school district sent Plaintiff a letter advising her that it would be meeting with her to discuss her "[f]ailure to follow appropriate guidelines when reporting late for work." (D.I. 45 at 128). On March 12, 2012, three days after this meeting, the School District issued a written reprimand to Plaintiff, highlighting two specific violations of the callout procedure and recommending a one day suspension. (*Id.* at 131). Plaintiff denied the first violation. (D.I. 45 at 9–10).

In May 2012, the school district prepared a written performance evaluation of Plaintiff that gave her poor marks for attendance, explaining that it was due to her many absences, late arrivals, and failure to follow the callout procedure. (D.I. 45 at 145–46). At the end of the evaluation it stated, "the [Sussex Consortium] Administration is recommending that your services be terminated at the conclusion of this school year." (*Id.* at 146). Plaintiff submitted a formal rebuttal to the evaluation, contesting several aspects of the evaluation. (*Id.* at 147). Plaintiff contended throughout her deposition that this May 2012 performance evaluation said, "your services are no longer needed," and that she understood this evaluation as a termination of her employment with the school district. (D.I. 45 at 18–22).

After submitting her formal rebuttal, Plaintiff did not communicate any further with school administrators. Instead she only spoke to her union representative, Joe Kirk. (*Id.* at 18). At the end of the 2011–2012 school year, Joe Kirk approached Plaintiff about the possibility of a Reduction in Force Agreement ("RIF") with a waiver of her right to return, in lieu of termination, so that she could collect unemployment benefits. (D.I. 51-1 at 18). Plaintiff maintains that no one from the school district contacted the union to suggest that she was not

5

going to be terminated, and that, based on her evaluation and these discussions with Joe Kirk, her only options were to accept an RIF agreement with no recall rights or be terminated. (D.I. 50 at 18; D.I. 51-1 at 20). Defendant asserts that the RIF Agreement was Plaintiff's idea and that she proposed it. (D.I. 44 at 15; D.I. 45 at 116–17). Notes written by Joe Kirk on July 24, 2012 say "[d]istrict will be discussing Valeria's status this week, would still agree to RIF—with waiver to return—as opposed to termination." (D.I. 45 at 148).[3] A subsequent July 31, 2012 email from Joe Kirk to Superintendent Robert Fulton stated that Plaintiff "has indicated an interest in reaching an agreement with the district to avoid a possible termination." (*Id.* at 149).

On August 1, 2012, Defendant formalized the discussed RIF agreement—with a waiver of Plaintiff's recall rights—in a letter from Assistant Superintendent Robert Fulton to Plaintiff. (D.I. 45 at 151). Plaintiff subsequently refused to sign the agreement because she did not want to forfeit her recall rights. (D.I. 51-1 at 18). Plaintiff initiated no further contact with the school district from that point forward and asserts that no one from the district contacted her regarding the 2012–2013 academic school year. (D.I. 50 at 19). The school district made two attempts to contact Plaintiff, sending each communication both by certified mail and email, one of which asked the Plaintiff to attend a meeting on the first day of school "to make some decisions about [her] continued employment with the district." (D.I. 44 at 16; D.I. 45 at 157). Plaintiff maintains that she never received the certified mail receipts from the school district's letters or the corresponding emails with the letters attached. (D.I. 51-1 at 22–23).

Plaintiff did not contact anyone at the school district about the upcoming school year and ultimately did not return to work for the 2012–2013 school year. (D.I. 44 at 16). The school district treated Plaintiff's failure to respond to its correspondence or to show up to work as job

---

[3] Joe Kirk was not deposed. His handwritten notes, at this point, do not appear to be admissible evidence.

abandonment and sent her a letter on August 30, 2012 notifying her that it was recommending

her termination to the Board of Education. (*Id.* at 17; D.I. 45 at 159). On September 14, 2012,

the school district sent Plaintiff a letter informing her that the Board of Education had officially

terminated her employment at the district. (D.I. 44 at 17; D.I. 45 at 162).

## II.    LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the

moving party may be discharged by pointing out to the district court that there is an absence of

evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986);

*Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving

party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or

other materials; or (B) showing that the materials cited [by the opposing party] do not establish

the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

### A.   Family and Medical Leave Act ("FMLA") Claims

The FMLA allows eligible employees to take leave to attend to their own medical conditions, as well as to attend to any child, spouse, or parent with a serious health condition. *See* 29 U.S.C. § 2601(b)(2) (2012). It seeks to do so "in a manner that accommodates the legitimate interest of employers." *Id.* § 2601(b)(3). An employee returning from FMLA leave is then entitled to be restored to the employment position held before leave commenced or to an otherwise equivalent position. *See id.* § 2614(a)(1). There are two distinct claims arising under the FMLA: retaliation and interference, both of which Plaintiff presents here. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr. (Lichtenstein I)*, 691 F.3d 294, 301 (3d Cir. 2012).

#### 1.   Retaliation

Under the FMLA, employers are prohibited "from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights," nor can they "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions." 29 C.F.R. § 825.220(c). In order to state a *prima*

8

*facie* case of retaliation under the FMLA, "the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein I*, 691 F.3d at 301–02.

### a. Invocation of Right to FMLA Leave

Defendant argues that Plaintiff cannot invoke any claims under the FMLA because she was not FLMA eligible during the 2011–2012 school year. (D.I. 44 at 19). Plaintiff argues that Defendants are estopped from arguing her ineligibility for FMLA leave, because she was never told she did not qualify for FMLA during that school year and was affirmatively led to believe that the leave the school district did grant that year was FMLA leave. (D.I. 50 at 20–22).

It is undisputed that Plaintiff attempted to invoke intermittent FMLA leave during both the 2010–2011 and 2011–2012 school years. The school district granted Plaintiff's FMLA request during the 2010–2011 school year. Plaintiff was not eligible, however, for FMLA leave during the 2011–2012 school year, because she worked an insufficient number of hours the previous year. (D.I. 44 at 11; D.I. 50 at 16). The parties contest whether Defendant actually informed Plaintiff that she did not qualify for FMLA leave during the 2011–2012 school year. (D.I. 44 at 11, D.I. 50 at 16). There is conflicting evidence in the record regarding whether the school district led Plaintiff to believe that she was on FMLA leave. Indeed, several of its administrators appeared to believe themselves that she was on FMLA leave.

Because the school district referenced attendance issues during the 2010–2011 school year as a reason it recommended termination, as discussed in greater detail *infra* in Part III.A.1.c, I am satisfied that Plaintiff's 2010–2011 invocation of FMLA rights is sufficient to meet the invocation of rights element. In any event, whether Plaintiff was led to believe that her leave

during the 2011–2012 school year was FMLA leave is a disputed issue of material fact that should be left to the jury to decide.

### b. Adverse Employment Action

Defendant argues that it did not take any adverse employment action against Plaintiff. Defendant argues that she abandoned her position with the school district, and it only terminated her after she failed to show up to work for the 2012–2013 school year. (D.I. 44 at 23). Plaintiff argues that she was terminated when she received her May 2012 performance evaluation recommending that she be terminated at the conclusion of the school year. (D.I. 50 at 24; D.I. 51-1 at 20–21). Plaintiff also appears to suggest a constructive discharge theory, essentially contending that the school district gave Plaintiff an ultimatum of either accepting the RIF agreement with no recall rights or being terminated. (D.I. 50 at 24 n.49). Defendant responds that Plaintiff's performance evaluation did not serve as a termination but only as an annual evaluation with a recommendation that she be terminated. (D.I. 44 at 23).

In order to meet the adverse employment action prong of the *prima facie* case, a plaintiff must demonstrate "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). "Although something less than a discharge could be an adverse employment action, a plaintiff must be able to point to a significant action, such as a demotion, involuntary transfer, or loss of other tangible benefits, in order to show that she was constructively discharged." *Barnett v. N.J. Transit Corp.*, 573 F. App'x 239, 243–44 (3d Cir. 2014) (citation and internal quotation marks omitted), *cert. denied*, 135 S. Ct. 1493 (2015). The elements of a *prima facie* case "depend on the facts of the particular case" and "cannot be established on a one-size-fits-all basis." *Jones v.*

10

*Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999). District courts within the Third Circuit have generally found that loss of employment through a Reduction in Force (RIF) Agreement is sufficient to meet the adverse employment action prong of the *prima facie* case. *See, e.g.*, *Atchinson v. Sears*, 666 F. Supp. 2d 477, 491 (E.D. Pa. 2009); *McBride v. Princeton Univ.*, 1991 WL 66758, at *4 (D.N.J. Apr. 24, 1991).

Several Courts of Appeals have held that a negative performance evaluation, without a further showing of ensuing short or long-term consequences on one's employment, does not constitute an adverse employment action. *See Barnett*, 573 F. App'x at 243–45; *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000) ("A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment."); *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) ("There is little support for the argument that negative performance evaluations alone can constitute an adverse employment action."). Rather, "[a]n unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Spears*, 210 F.3d at 854.

Constructive termination occurs where "an employer knowingly permit[s] conditions of discrimination so unpleasant that a reasonable person would have felt compelled to resign." *Barnett*, 573 F. App'x at 244. At the summary judgment stage, "a court must determine whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001). Courts apply an objective test to determine if there is a constructive discharge, but common examples of constructive discharge include threatening to fire an employee, urging an employee to resign, demotions, reductions in pay or benefits,

11

involuntary transfer to a less desirable position, or alteration of job responsibilities. *See Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993). Giving an ultimatum to an employee that she must resign or face termination would therefore constitute a constructive discharge sufficient to establish an adverse employment action. *Cf. Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 414 (3d Cir. 1999) (assuming that school district giving plaintiff "ultimatum of resigning or facing termination" was an adverse employment action and proceeding to analyze the district's legitimate, non-discriminatory reason for such action).

Here, it is clear from the record that the school district was interested in terminating Plaintiff. There were ongoing negotiations over the summer between school district officials and her union representative about how to characterize that termination. The negotiations did not result in a resolution of that issue. On this record, I cannot say that a reasonable jury would be unable to conclude that Plaintiff was placed in a position where her only choices were to accept the proposed RIF with no recall rights or be terminated. Therefore, the question of whether the Defendant's actions constitute an adverse employment action against Plaintiff is one that the jury should decide.

### c. **Causal Connection**

Defendant essentially argues that Plaintiff's failure to follow the district's callout procedure prevents her from establishing any causal relationship between her FMLA leave and her loss of employment, or in the alternative, prevents Plaintiff from proving pretext. (D.I. 44 at 24–26; D.I. 52 at 6–8). Plaintiff points to the fact that her May 2012 performance evaluation expressly states that her poor "attendance" over the past few school years was the reason for the termination recommendation. (D.I. 50 at 23). Plaintiff argues further that her FMLA retaliation claim should be analyzed under a mixed-motive framework and asserts that the school district's

12

termination recommendation provides direct evidence that her FMLA leave was considered in the termination recommendation. (*Id.*). Defendant fails to respond to Plaintiff's arguments for the mixed-motive framework. Because the evidence Plaintiff presents to meet the causation element of her *prima facie* case and her burdens under a mixed-motive framework is the same, I will consider these arguments together here.

FMLA retaliation claims focus on an employer's retaliatory intent. Therefore, "courts have assessed these claims through the lens of employment discrimination law." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr. (Lichtenstein I)*, 691 F.3d 294, 302 (3d Cir. 2012). "Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins.*" *Id.* (citations omitted). The Third Circuit has approved the use of the *Price Waterhouse* mixed-motive framework in FMLA retaliation claims. *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 147 (3d Cir. 2004). Although it recently questioned the continued validity of mixed-motive FMLA retaliation claims following the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, the Third Circuit has "continue[d] to save [its] full analysis of this question for another day." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr. (Lichtenstein II)*, 598 F. App'x 109, 112 n.4 (3d Cir. 2015) (citation omitted). It recently noted, however, that it is "satisfied for now that giving a mixed-motive instruction in an FMLA case is not clearly contrary to the Supreme Court's rulings in either [*Gross* or *Nassar*]." *Id.* (citations omitted). Thus, I assume that a mixed-motive claim remains viable in FMLA retaliation suits.[4]

---

[4] It is worth noting that another district court within this Circuit recently analyzed an FMLA retaliation claim under the *Price Waterhouse* mixed-motive framework. *See Beese v. Meridian Health Sys., Inc.*, 2014 WL 3519124, at *3– 8 (D.N.J. July 16, 2014).

Under a mixed-motive framework, a plaintiff first has the burden of persuasion of showing direct evidence that FMLA leave was used as "negative factor" in taking the adverse employment action against her. *See Conoshenti*, 364 F.3d at 147. Direct evidence in the *Price Waterhouse* context requires Plaintiff to show evidence "sufficient to allow the jury to find that the decision makers placed a substantial negative reliance" on the impermissible factor in reaching their decision. *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 512 (3d Cir. 2004). Once the plaintiff presents such evidence, "the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have [taken the adverse employment action against] plaintiff even if it had not considered [the FMLA leave]." *Conoshenti*, 364 F.3d at 147 (second alteration in original). "This is a high burden on a motion for summary judgment because [Defendant] must leave no doubt that a rational jury would find that" it would have taken the same adverse employment action against Plaintiff absent the improper consideration. *Glanzman*, 391 F.3d at 514.

Direct evidence must be more than "stray remarks in the workplace" or "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring). Instead, a plaintiff must show "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Id.* In *Price Waterhouse* itself, a Title VII case, the Court held that "comments [regarding sexual stereotypes] in the performance evaluations upon which the decisionmakers based their decision to terminate the plaintiff" were sufficient direct evidence to show substantial negative reliance on an impermissible factor. *See Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir. 1994) (citing *Price Waterhouse*, 490 U.S. at 232–37). Likewise, the Third Circuit found, in an ADEA case, that a workplace order from a

14

manager responsible for layoff decisions, which directed supervisors to consider age in the assignment of work, was sufficient direct evidence of improper consideration of age. *See Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995).

Here, a close look at Plaintiff's May 2012 performance evaluation, which ultimately recommended her termination, reveals numerous general references to "attendance" as being the principal reason for the termination recommendation:

> When you are here, the interpreter services you provide to the students in the HHPD program are of a high quality. However, [your] attendance has been an issue again this year.... Your attendance issues were mentioned in your SY 09/10 evaluation, marked as unsatisfactory and needs to improve in your SY 10/11 evaluation, and marked as unsatisfactory again in this year's evaluation. As a result, the [Sussex Consortium] Administration is recommending that your services be terminated at the conclusion of this school year. (D.I. 45 at 146).

Indeed, this evaluation states that Plaintiff's attendance during the 2010–2011 school year, a year in which she was exercising intermittent FMLA leave, was directly considered in recommending her termination.[5] Much like the performance evaluation that was considered in deciding to terminate the plaintiff in *Price Waterhouse*, Plaintiff's May 2012 performance evaluation would allow a reasonable jury to conclude that Defendant "placed substantial negative reliance on an illegitimate criterion" in pursuing Plaintiff's termination. *See Price Waterhouse*, 490 U.S. at 232–37, 277. Because Plaintiff has carried her burden of providing direct evidence that her FMLA leave was considered in the recommendation that she be terminated, Defendant must carry its burden of showing that it would have taken the adverse employment action even absent the improper consideration.

---

[5] This direct evidence that FMLA-qualifying absences, during the 2011–2011 school year, were considered in the termination recommendation obviates the need for Plaintiff's estoppel argument. In any event, whether or not Plaintiff was led to believe she qualified for FMLA leave during the 2011–2012 school year is a fact that is vigorously disputed by the parties. It is therefore a jury question.

The May 2012 performance evaluation also states that the "[a]dministration has met with [Plaintiff] on two occasions, 9/22/11, and 3/9/12, regarding not following procedures for reporting late and leaving early from work." (D.I. 45 at 146). Moreover, Defendant provides letters to corroborate that these meetings happened and that the topic of discussion was Plaintiff's failure to follow the callout procedures. (D.I. 45 at 107, 124, 128, 131). Plaintiff maintains, however, that she always followed the callout procedure and that the school district's allegations to the contrary are false. (D.I. 50 at 13; D.I. 50-1 at 38; D.I. 51-1 at 29). She also cites documentation where she challenged some of the school district's claims that she was not following the callout procedure. (D.I. 50-1 at 38).

Whether Plaintiff failed to follow the callout procedure appears to be a disputed issue of material fact. Accordingly, the Court will deny Defendant's motion for summary judgment as to the FMLA retaliation claim.

### 2. Interference

Plaintiff did not affirmatively plead a claim for interference under the FMLA in her complaint. (*See generally* D.I. 1). However, at various points in her brief opposing summary judgment and at oral argument, Plaintiff argued a claim for interference under the FMLA, in addition to the retaliation claim pleaded her in complaint. (D.I. 50 at 28–29). Therefore, for the sake of completeness, I will address the interference argument.

In order to state a claim for interference under the FMLA, a plaintiff must prove "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Ross v. Gilhuly*, 755 F.3d

185, 191–92 (3d Cir. 2014). The Third Circuit recently clarified that "for an interference claim

to be viable, the plaintiff must show that FMLA benefits were actually withheld." *Id.* at 192

(citation omitted); *see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr. (Lichtenstein II)*, 598 F.

App'x 109, 144 (3d Cir. 2015) (dismissing interference claim based upon use of FMLA leave as

a negative factor in decision to terminate employee, because plaintiff's claim was "distinctly *not*

one for interference"). In *Ross*, the plaintiff asserted a claim for interference under the FMLA,

arguing that his termination—well after he was granted FMLA leave—constituted a denial of

benefits sufficient to satisfy the fifth prong of an interference claim. *See Ross*, 755 F.3d at 192.

The Third Circuit noted that the plaintiff "confuse[d] interference with retaliation and [was] thus

misdirected," and noted that an interference action only concerns "whether the employer

provided the employee with the entitlements guaranteed by the FMLA." *Id.* (internal citation

and quotation marks omitted) For this reason, absent an allegation that the defendant withheld a

benefit guaranteed by the FMLA, the Third Circuit held that the plaintiff failed to state a claim

for interference. *See id.*

Plaintiff argues that she can establish a denial of rights under the FMLA—the fifth

element of an interference claim—through her termination and the ongoing discipline she

received during years she exercised her right to intermittent FMLA leave. (D.I. 50 at 29).

Plaintiff's argument suffers from the same deficiencies highlighted by the Third Circuit in *Ross*,

namely that it "confuses interference with retaliation." *Ross*, 755 F.3d at 192. Here, it is

undisputed that Plaintiff's request for intermittent FMLA leave was granted for the 2010–2011

school year. (D.I. 1 at 3; D.I. 44 at 9). Moreover, it is uncontested that Plaintiff was not eligible

for FMLA leave during the 2011–2012 school year. (D.I. 44 at 11; D.I. 50 at 16). Much like in

*Ross*, Plaintiff fails to claim that FMLA benefits were improperly withheld. *See Ross*, 755 F.3d

17

at 192. In fact, the record flatly contradicts any assertion that benefits were improperly denied under the FMLA, as the school district granted her request for intermittent FMLA leave during the 2010–2011 school year, the year in which she was eligible. Accordingly, Plaintiff's claim for interference under the FMLA has no factual basis and Defendant is entitled to summary judgment.

### B. Americans with Disabilities Act ("ADA") Claims

#### 1. Disability Discrimination (including Failure to Accommodate)

The Americans with Disabilities Act ("ADA") provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2012). The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

In order to state a *prima facie* case of discrimination under the ADA, a plaintiff is required to show "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." *Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). The ADA provides specific examples of conduct that constitute prohibited discrimination under the statute. *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 186 (3d Cir. 2009) (citing 42 U.S.C. § 12112(b)). Discrimination within the meaning of the ADA includes "not making reasonable accommodations to the known physical or mental

18

limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). Accordingly, a plaintiff can meet the third prong of the *prima facie* case by demonstrating an employer's refusal to make reasonable accommodations to his or her disabilities.[6] *See Williams*, 380 F.3d at 761.

### a. Disability

Defendant argues that the record does not substantiate that Plaintiff either had a disability that limits a major life activity or that she was regarded as having a disability. (D.I. 44 at 21). Plaintiff argues that she has an actual disability by directing the Court to an exhibit containing a series of her medical records. (D.I. 50 at 30). When asked by the Court at oral argument to clarify what Plaintiff claimed as her disability, Plaintiff asserted that the disability was a "threefold" combination of fibromyalgia, rotator cuff/tendonitis, and a cervical herniated disk and cervical sprain. (D.I. 64 at 70–71). Plaintiff also clarified that the major life activity she is limited in is "working." (*Id.* at 71). Plaintiff also provides rather cursory arguments that "her employer perceived her as disabled," which the Court interprets as arguing that she also can meet the first prong of her *prima facie* case by showing she is "regarded as having [] an impairment." (D.I. 50 at 31).[7]

---

[6] Plaintiff separately pleaded and argued claims for "disability discrimination" and "failure to accommodate." (D.I. 1 at 6; D.I. 50 at 29–30). However, failure to accommodate is itself a type of disability discrimination claim. *See* 42 U.S.C. § 12112(b)(5)(A); *Williams*, 380 F.3d at 371. In these separate sections of her brief, Plaintiff merely addresses different aspects of a *prima facie* case of disability discrimination, all going toward her ultimate contention that the school district did not provide a reasonable accommodation. (D.I. 50 at 29–30). Accordingly, I will consider these claims together as a single claim for disability discrimination under the ADA.
[7] Because the Court is satisfied that a reasonable jury could find that Plaintiff suffered from an actual disability, the Court finds it unnecessary to address Plaintiff's "regarded as having [] an impairment" argument here, as it is merely another way for Plaintiff to prove the first element of her *prima facie* case. *See* 42 U.S.C. § 12102(1). In any event, Plaintiff may still proceed with this argument at trial.

19

The ADA provides that a disability can be proven by showing one of three things: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

With regard to Plaintiff's claim that she suffered from an actual disability under the ADA, I first note that, in conjunction with her request for an accommodation, she only provides record evidence that she notified school administrators of her fibromyalgia. (D.I. 50-1 at 58; D.I. 50 at 15). Nowhere in the record is there evidence that she referenced her rotator cuff tendonitis or cervical spine issues when making this request. For purposes of assessing her claim for an "actual disability," therefore, I will only consider Plaintiff's fibromyalgia as the "physical impairment" forming the basis of her actual disability argument.

Defendant does not contest that fibromyalgia is a "physical impairment under the ADA." Its arguments concern whether Plaintiff proved that the fibromyalgia "substantially limited a major life activity." EEOC regulations provide that:

> An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of [the ADA].

29 C.F.R. § 1630.2(j)(1)(ii). Moreover, the regulations provide that:

> The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis."

*Id.* at § 1630.2(j)(1)(iii). Finally, the regulations point out that "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life

activity by most people in the general population usually will not require scientific, medical, or statistical analysis." *Id.* §1630.2(j)(1)(v).

Under this standard, I conclude that a reasonable jury could find that Plaintiff's fibromyalgia substantially limits her in the major life activity of working. Plaintiff provided evidence that she suffers from fibromyalgia, which flares up unpredictably, making it difficult for her to get up in the morning and make it through certain work days. (D.I. 50-1 at 58, 66). A reasonable jury could therefore conclude, under this standard that does "not demand extensive analysis," that compared to "most people in the general population" Plaintiff's ability to work on a day-to-day basis is substantially limited by her fibromyalgia. *See* 29 C.F.R. §§ 1630.2(j)(1)(iii), 1630.2(j)(1)(ii).

### b. Qualified Individual

The second prong of Plaintiff's prima facie case of discrimination under the ADA requires a showing that she is a "qualified individual." *See Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 768 (3d Cir. 2004). A qualified individual is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that [she] holds or desires." 42 U.S.C. § 12111 (2012). Accordingly, a plaintiff must show that she "satisf[ies] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." and that she can "perform the essential functions of the position." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311 (3d Cir. 1999) (citation and internal quotation marks omitted).

Defendant does not contest Plaintiff's status as a qualified individual. In any event, I conclude that the record as a whole provides sufficient evidence to allow a reasonable jury to

conclude that Plaintiff can perform the essential functions of the job of a sign-language interpreter, with or without a reasonable accommodation.

### c. Failure to Accommodate

The third element of Plaintiff's *prima facie* case can be established by showing that the employer failed to make "reasonable accommodations to [her] known physical or mental limitations . . . unless [it] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). Defendant argues that it offered Plaintiff the reasonable accommodation of intermittent unpaid leave, and that it is not otherwise obligated to provide Plaintiff with her preferred accommodation once it offered a reasonable accommodation. (D.I. 44 at 22). Defendant also argues that Plaintiff's request for a later start time is unreasonable, and that the school cannot be expected to change its hours or leave a student without his interpreter during the school day. (*Id.*). Plaintiff argues that the school district's flat refusal of her request for a later start time, without additional discussion, breached its duty to engage in the "interactive process" in seeking a potential accommodation for Plaintiff. (D.I. 50 at 29–30).

In order to prove that an employer breached its duty to engage in good faith in the interactive process under the ADA, the employee must show: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 772 (3d Cir. 2004) (citation omitted).

22

EEOC regulations define the term reasonable accommodation as, "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held . . . is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii). In this context, reasonable accommodations may include, among other things, "[j]ob restructuring" and "part-time or modified work schedules." *Id.* § 1630.2(*o*)(2)(ii). Once a request for an accommodation is made, "an employer has a duty under the ADA to engage in an 'interactive process' of communication with an employee requesting an accommodation so that the employer will be able to ascertain whether there is in fact a disability. . . and thereafter be able to assist in identifying reasonable accommodations where appropriate." *Williams*, 380 F.3d at 771; *see also* 29 C.F.R. § 1630.2(*o*)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). Accordingly, an employee can prove its failure to accommodate claim by demonstrating "that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process . . . ." *Williams*, 380 F.3d at 772.

An employer's duty to engage in the interactive process in good faith is not triggered until the employer has received notice of the disability and a request for accommodation. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999). Requests for accommodations need not be in writing and need not specifically mention the ADA or use the exact phrase "reasonable accommodation." *See id.* However, the employee's request must be

sufficient to provide the employer with adequate notice of "both the disability and the employee's desire for accommodations for that disability." *Id.* The notice requirement comports with the ADA's language that an employer must provide reasonable accommodations for an employee's "known" disability. [8] *See id.* (citing 42 U.S.C. § 12112(b)(5)(A)).

Once on notice of an employee's disability and request for accommodation, the interactive process "requires the employer to take some initiative" to communicate with the employee and consider "potential reasonable accommodations that could overcome [the employee's] limitations." *Id.* at 315; 29 C.F.R. § 1630.2(*o*)(3). An employer "cannot escape its duty to engage in the interactive process" simply because the proposed accommodation of the employee is not reasonable or would not prevail in litigation. *See Taylor*, 184 F.3d at 317. While an employee must convince a jury that "the employee would have been able to perform the job with accommodations[, i]n making that determination, the jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations." *Id.* at 317–18. Accordingly, the Third Circuit has cautioned courts to "not readily decide on summary judgment that accommodation was not possible" where "an employee has evidence that the employer did not act in good faith in the interactive process." *Id.* at 318. Therefore, "where there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded." *Id.*

Here, a reasonable jury could conclude from the evidence presented that the school district knew of Plaintiff's fibromyalgia, that she requested the accommodation of a later start time, that the school district did not make a good faith effort to assist her in seeking a reasonable

---

[8] In conjunction with her request for a later start time, Plaintiff only provides record evidence that she notified school administrators of her fibromyalgia. (D.I. 50-1 at 58; D.I. 50 at 15). For this reason, Plaintiff's claim for failure to accommodate must only focus on her fibromyalgia, because this is the only physical impairment Plaintiff provided the school district with sufficient notice of when making this request.

accommodation, and that she may have been accommodated but for the employer's lack of good faith. Plaintiff requested the accommodation of a later start time because of her fibromyalgia. (D.I. 50-1 at 58). She contends that the answer to her request was a succinct "no," without further discussion. (D.I. 50 at 15). Defendant cannot escape its duty to engage in good faith in the interactive process by now arguing it granted her unrelated request for intermittent FMLA leave made at a different point in time. Further, Defendant's argument that Plaintiff's requested accommodation was not reasonable fails to address the argument of a duty to engage in the interactive process in good faith.

Viewing the evidence in the light most favorable to Plaintiff as the non-moving party, I conclude that if a jury were to credit Plaintiff's testimony, it could reasonably find that the school district failed to engage in good faith in the interactive process. Therefore, summary judgment is not appropriate as to Plaintiff's claim for disability discrimination under the ADA.

## 2. ADA Retaliation

Defendant argues that Plaintiff cannot establish a causal connection between her request for an accommodation and any adverse employment action. (D.I. 44 at 23). In addition, Defendant renews its argument that Plaintiff did not actually suffer an adverse employment action. (*Id.* at 22–23). Plaintiff's ADA retaliation argument consists simply of "refer[ring] this Court to her FMLA retaliation arguments," while additionally noting her request for a modified work schedule. (D.I. 50 at 30).[9]

The ADA retaliation provision requires that, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA]

---

[9] Plaintiff's briefing on her ADA retaliation claim was cursory and simply incorporates other briefing by reference, which was not very helpful to the Court. (D.I. 50 at 30). Some effort was made by the Court to interpret Plaintiff's argument. The Court addresses what it perceives Plaintiff's argument to be, but to the extent the arguments in Plaintiff's brief are not presented in a discernible manner, the Court considers them waived.

25

or because such individual made a charge" under the ADA. 42 U.S.C. § 12203(a) (2012). To state a *prima facie* case of retaliation under the ADA, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004). "Unlike a claim for discrimination under the ADA, an ADA retaliation claim based upon an employee having requested an accommodation does not require that a plaintiff show that he or she is 'disabled' within the meaning of the ADA." *Id.* at 759 n.2. Instead, "a plaintiff need only show that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested." *Id.* (citation omitted)

The first prong of Plaintiff's *prima facie* case is met, as it is undisputed that Plaintiff made a request to Vivian Bush for the accommodation of a later start time. (D.I. 51-1 at 27). As to the second prong, the above analysis in Part III.A.1.b, *supra*, regarding the FMLA retaliation claim, applies equally to the ADA retaliation claim. Accordingly, there is a genuine issue of material fact for the factfinder to decide concerning whether the district took an adverse employment action against Plaintiff.

With regard to the causation element, Plaintiff fails to offer any evidence from which a reasonable jury could find a causal connection between her request for an accommodation and any alleged adverse employment action. One accepted method for a plaintiff to prove a causal connection is to show that "the timing of the alleged retaliatory action [is] 'unusually suggestive' of retaliatory motive." *See Yovtcheva v. City of Phila. Water Dep't*, 518 F. App'x 116, 123 (3d Cir. 2013). A plaintiff can also "establish a link between his or her protected behavior and

26

subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir. 1997).

Here, Plaintiff's proffered evidence regarding timing and antagonism refer exclusively to periods following her requests for FMLA leave. (D.I. 50 at 25–27). Plaintiff's retaliation arguments thus only have relevance in the context of her FMLA retaliation claim. For instance, her assertions of "unusually suggestive timing" all refer to the temporal proximity to her FMLA leave days and requests. (*Id.* at 25–26). Plaintiff's failure to accommodate claim under the ADA exclusively refers to her request for the accommodation of a later start time, not her request for FMLA leave. (*Id.* at 29–30).

Plaintiff cannot simply rely, for purposes of proving her ADA retaliation claim, on the same facts that form the basis of her FMLA retaliation claim, as such claims require two distinct inquiries. Plaintiff does not state, nor does a search of the record reveal, the date on which she asked Ms. Bush for the accommodation of a later start time.[10] Moreover, she also fails to make any arguments showing the temporal proximity of her request for the accommodation of a later start time and any subsequent adverse employment action. Without a timeline for this requested accommodation, I also cannot discern what "antagonistic" actions may have been taken in response to this request. Because Plaintiff fails to offer any evidence from which a reasonable jury could find a causal connection between her request for an accommodation under the ADA and any alleged adverse employment action, she fails to state a *prima facie* case of retaliation under the ADA and Defendant is entitled to judgment as a matter of law regarding this claim.[11]

---

[10] Mr. Murauskas describes the request as being "about the end of the 2011/2012 school year." (D.I. 50-1 at 58). There is no evidence whether this is before or after the evaluation that Plaintiff asserts was her termination.

[11] Unlike with her FMLA Retaliation claim, Plaintiff has not provided any direct evidence that her request for a later start time was an impermissible factor in any adverse employment decision against her. Therefore she cannot proceed under a mixed-motive framework. Accordingly, the Court finds that even if Plaintiff were able to establish causation, she has not presented sufficient evidence—or any evidence at all—to establish pretext under the

## IV.    CONCLUSION

For the reasons set forth above, the Court will grant Defendant's motion for summary judgment on the FMLA Interference and ADA Retaliation claims, and deny Defendant's motion for summary judgment as to the FMLA retaliation and ADA Disability Discrimination claims. A separate order, consistent with this Memorandum Opinion, will be entered.

---

*McDonnell Douglas* burden-shifting framework. Under this framework, the school district has offered the legitimate non-discriminatory reason of Plaintiff's failure to follow the callout procedure as the reason for any action taken against her. (D.I. 44 at 24–26). "To make a showing of pretext, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (citation omitted) (internal quotation marks omitted). The Court therefore concludes that Plaintiff has not presented sufficient evidence such that a reasonable jury could conclude that the School District's legitimate non-discriminatory reason was a pretext for invidious discrimination on the basis of a disability.